STARBRITE WATERPROOFING
CO., INC., Plaintiff,

v.

AIM CONSTRUCTION & CONTRACTING CORP., Aim Construction Corporation, and Seaboard Surety Company, Defendants.

95 Civ. 3447 (DC).

United States District Court, S.D. New York.

Feb. 20, 1996.

Friedland Fishbein Laifer & Robbins, L.L.P. by Seth D. Friedland and Michael G. Lewis, New York City, for Plaintiff.

Max E. Greenberg, Trager, Toplitz & Herbst, by Mark A. Rosen, New York City, for Defendants.

## MEMORANDUM DECISION and ORDER

CHIN, District Judge.

Plaintiff Starbrite Waterproofing Co., Inc. ("Starbrite") seeks sanctions against defendants Aim Construction Corp. ("ACC"), Aim Construction & Contractors Corp. ("ACCC"), and Seaboard Surety Company ("Seaboard") pursuant to Rule 37 of the Federal Rules of Civil Procedure for their purported failure to comply with their discovery obligations. Starbrite requests that the Court strike defendants' answer and enter a default judgment for the amount requested in the complaint, together with interest, attorneys' fees, and costs.

Because I find that defendants have engaged in a pattern of dilatory conduct and disregarded their obligations under the Federal Rules of Civil Procedure as well as orders of this Court, plaintiff's motion is granted. The answer will be stricken and judgment will be entered in favor of plaintiff.

### The Facts

In 1993, ACC entered into a contract with the United States to provide materials and labor for certain restoration work at the West Point Military Academy. Seaboard provided a surety bond. ACC subcontracted a portion of the contract to ACCC, which, in turn, subcontracted a portion of its work to Starbrite.

The amended complaint alleges that Starbrite performed all of its contractual obligations and that it consequently was entitled to be paid some $300,000. The amended complaint further alleges, however, that defendants ACC and ACCC failed to pay Starbrite $127,212 of the amount to which it was entitled.[1] Moreover, the amended complaint alleges that defendants were paid by the United States for the work performed by Starbrite. Finally, the amended complaint alleges that because ACC operated, dominated, and controlled ACCC, ACC is also liable to Starbrite for the balance due.

1. The disputed amount represents approximately 30% of Starbrite's gross revenues for 1995.

### Prior Proceedings

This action was filed in May 1995. Starbrite served discovery requests (interrogatories, document requests, and notices for the depositions of Michael Ahmad and Patricia Ahmad) by hand on May 16, 1995. Hence, defendants' responses to the discovery requests were due June 15, 1995. The depositions of the Ahmads were noticed for June 22 and 23, 1995.

Defendants' time to respond to the amended complaint was extended, by agreement, to June 28, 1995. No agreement was made with respect to Starbrite's discovery requests. (See Friedland Aff.Exh. 8). Starbrite's counsel called defendants' counsel on June 20th and 21st several times to inquire about the discovery requests, but the telephone calls were not returned. (Id. ¶ 7). They finally reached defendants' counsel the evening of June 21, 1995. At that time, defendants' counsel advised plaintiff's counsel that the Ahmads would not be produced for their depositions on the dates for which they had been noticed. (Id. ¶ 7). Starbrite's attorneys objected to any delay in discovery and sent a letter noting that Starbrite had never agreed to postpone the depositions. The letter asserted that because of the harm that the delay in payment caused Starbrite, Starbrite had "no interest or flexibility whatsoever in delaying discovery." (Id. Exh. 9).

Defendants did not respond either to the letter or to follow-up telephone calls made by Starbrite's counsel or to the outstanding discovery requests. (Id. ¶ 9). Consequently, Starbrite's counsel sent defendants' counsel a letter on July 12, 1995 requesting compliance. (Id. Exh. 11). Defendants' counsel responded with a letter dated July 13, 1995, which contended that Fed.R.Civ.P. 26(d) prohibited the serving of discovery requests until after a conference. (Id. Exh. 12). Because this Court had chosen to "opt out" of this provision, however, defendants' counsel was wrong—as he was so advised by Starbrite's attorneys. (Id. Exh. 13). Nonetheless, Starbrite's attorneys offered to meet with defendants' counsel to discuss discovery. (Chesney Aff. ¶ 3 n. 1).

Defendants' attorneys ignored this offer as well, and hence Starbrite's attorneys requested assistance from the Court. I held a conference on August 7, 1995. I was persuaded at the conference that defendants had been dilatory in meeting their discovery obligations and that Starbrite was being prejudiced as a result. Moreover, I was troubled by defendants' arrogance in believing they could simply ignore plaintiffs' discovery requests, letters, and telephone calls. Hence, I ordered defendants to respond ·to the interrogatories and document requests by August 15, 1995, and I ordered that the Ahmads be produced for deposition during the week of September 11, 1995. I set October 6, 1995 as the discovery cut-off date, and I informed the parties that I would not extend the discovery dates (in the absence of consent). Although I did not issue a written order, Starbrite's counsel sent defendants' counsel a letter confirming my oral rulings. (Friedland Aff. Exh. 15).

Defendants failed to comply with my August 7th order. Although defendants made certain documents available for inspection by plaintiff's counsel, defendants produced little more than copies of the base contract (with exhibits) and the pleadings. Moreover, defendants neither served any response to the interrogatories, nor submitted a formal response to the document requests. (*Id.* ¶ 17). Starbrite's counsel sent defendants' counsel a letter dated September 5, 1995 outlining the deficiencies and requesting compliance. (*Id.* Exh. 16). The letter also noted that defendants' counsel was again failing to return Starbrite's attorneys' telephone calls.

On September 11, 1995, defendants' counsel finally called plaintiff's attorney. (*Id.* ¶ 18). The depositions of the Ahmads were adjourned at defendants' request until September 20 and 22, 1995. (*Id.*). On September 13, 1995, defendants produced some additional documents. (*Id.* ¶ 19). On September 18, 1995, plaintiff's attorneys spoke with defendants' counsel about additional discovery. No additional discovery was produced, however, nor were the Ahmads produced for deposition, notwithstanding further requests from plaintiff's counsel for compliance.

On October 11, 1995, although defendants had not served any discovery requests,[2] plaintiff produced copies of its file on this matter. Plaintiff did so on its own initiative to avoid further delays in the proceedings.

On October 13, 1995, I held another pretrial conference. Defendants' counsel conceded that certain documents had not been produced, including certain certifications and records relating to the mediation of the dispute. He also conceded that the interrogatories had not been answered. Under the circumstances, I ordered defendants to produce the additional documents and to respond to the interrogatories in three business days, *i.e.,* by October 18, 1995. I also ordered the depositions of *both* of the Ahmads to be commenced and completed by November 3, 1995. I specifically warned defendants' counsel that I would strike the answer if defendants did not comply. I overruled defendants' objection to plaintiff's request to depose Patricia Ahmad. Finally, I directed all discovery to be completed by November 30, 1995.

Incredibly, defendants again did not comply. In an effort to avoid producing Patricia Ahmad, defendants' counsel wrote a letter dated October 18, 1995 to plaintiff's counsel stating that "Ms. Ahmad is not an officer or employee of any of the defendants and has not been for some time." That statement was flatly contradicted by Ms. Ahmad herself at her deposition, when she testified that she was still president and 51% owner of ACC. (P. Ahmad Dep. at 22–23). Moreover, the letter stated that Ms. Ahmad was not available to be produced, when I had already ordered her to be produced. In addition, although Ms. Ahmad was finally produced for her deposition on October 31, 1995, she was made available only for two hours and ten minutes. Also, the transcript of her deposition shows that defendants had failed to produce all documents by October 18, 1995 as I had ordered. (*See, e.g.,* P. Ahmad Dep. at 13–14, 36–38, 48). Indeed, Patricia Ahmad testified that she had not assisted in "any

---

2. Although I had set October 6, 1995 as the discovery cut-off, defendants did not serve any discovery requests until November 6, 1995. (Friedland Aff. ¶ 23 n. 6).

way" in looking for documents that were relevant to the case. (*Id.* at 36).

Iqbal (or Michael) Ahmad was produced on November 3 and 7, 1995 but only for a total of approximately eight hours over both days. Moreover, Mr. Ahmad was evasive and defendants' counsel obstructed the deposition as well.[3] Finally, by letter dated November 8, 1995, defendants advised plaintiff that they would not produce the Ahmads for the completion of their depositions unless plaintiff agreed to restrict the inquiry in a manner designated by defendants. (Friedland Aff. Exh. 24). Although the parties thereafter agreed to continue the depositions, the agreement fell apart when defendants refused to produce certain documents that they contended were irrelevant and plaintiff refused to go forward without them. (Rosen 12/6/95 Letter Exhs. 4, 5, 6, 7, 8).

The parties submitted letters to the Court regarding the discovery disputes, and I conferenced the case again on November 30, 1995. Plaintiff's counsel's letter of November 30, 1995 was deemed a motion for sanctions and the parties were given an opportunity to submit additional papers.

### DISCUSSION

Rule 37(b)(2) of the Federal Rules of Civil Procedure provides that "[i]f a party ... fails to obey an order to provide or permit discovery ... the court ... may make such orders in regard to the failure as are just," including "an order striking out pleadings...." Sanctions under Rule 37 are intended "to ensure that a party does not benefit from its failure to comply, and 'to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Selby v. Arms*, 93 Civ. 6481 (DLC), 1995 WL 753894, at *7 (S.D.N.Y. Dec. 20, 1995) (*quoting Valentine v. Museum of Modern Art*, 29 F.3d 47, 49 (2d Cir.1994) (*quoting National Hockey League*

*v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S.Ct. 2778, 2780–81, 49 L.Ed.2d 747 (1976))). As the Second Circuit has held:

> Strong sanctions should be imposed only for serious violations of discovery orders.... Severe sanctions are justified, however, when the failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable.... Although an order granting a claim and precluding a party from presenting evidence in opposition to it is strong medicine, such orders are necessary on appropriate occasion to enforce compliance with the discovery rules and maintain a credible deterrent to potential violators.

*Daval Steels Prods. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir.1991).

In this case, defendants' conduct calls for the "strong medicine" of striking their answer and precluding them from presenting evidence in opposition to plaintiff's claim for the following reasons. First, defendants flouted their obligations under the Federal Rules of Civil Procedure; they ignored their obligations to respond to plaintiff's document requests and interrogatories and ignored plaintiff's counsel's telephone calls and at least one letter inquiring about the same. Consequently, plaintiff was required to seek assistance from the Court. Defendants thus frustrated the intent of the Federal Rules of Civil Procedure that discovery proceed "free from the time-consuming and costly process of court intervention." *Daval*, 951 F.2d at 1365.

Second, even after the Court intervened, defendants failed to comply with the Court's orders of August 7th and October 13th. Indeed, on October 13th I specifically warned defendants that I would strike their answer if they did not produce the Ahmads for depositions to be completed by November 3, 1995. They did not comply. *See Sieck v. Russo*,

---

**3.** *See, e.g.,* I. Ahmad Dep. at 26–27 (being evasive in answering questions regarding ACCC employees), 29 ("Q. And which corporate records are you referring to? A. You have to talk to my lawyer. They maintain all the records. Q. Did [ACCC] ever file any state or federal payroll taxes? A. Like I told you, I don't make payrolls. I am not familiar with the tax laws. They may have."), 37 (defendants' counsel objecting and then suggesting answer), 165–67 (refusing to directly answer yes or no questions), 170–71 (refusing to directly answer simple questions), 213–14 (being completely evasive), 229 (defendants' counsel made frivolous objection to questions as leading, even though witness was an adverse witness), 258–59 (refusing to answer questions directly), 288 (being obstructionist).

869 F.2d 131, 133 (2d Cir.1989) ("a party who flouts [discovery] orders does so at his own peril") (*quoting Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988)).

Third, defendants engaged in other obstructionist conduct and made repeated frivolous objections, including, for example, relying on a provision of the Federal Rules as to which this Court had opted out, asserting relevancy objections to questions and documents that were clearly relevant, and objecting to leading questions when leading questions may be asked of an adverse witness. The net effect of defendants' conduct is that plaintiff still has not completed the depositions of the Ahmads, even though they were originally noticed for deposition in June 1995, almost eight months ago.

Fourth, defendants made flat-out misrepresentations in their counsel's letter of October 18th. Defendants' counsel reported that he had been advised that Ms. Ahmad was not an officer or employee of any of the defendants and had not been for some time; yet, she testified to the contrary just a few weeks later.

Fifth, defendants adopted a completely cavalier attitude. For example, in response to questions asked by plaintiff's counsel at Ms. Ahmad's deposition about the location of a company, defendants' counsel objected and stated: "Look in a phone book." (P. Ahmad Dep. at 63). This kind of misguided sarcasm has no place in the practice of law.[4]

Finally, plaintiff has been prejudiced by defendants' dilatoriness. The amount of damages claimed in this case is relatively modest, but nonetheless it constitutes 30% of plaintiff's 1995 income. Plaintiff's counsel's efforts to move the case at a fast pace to minimize the harm to plaintiff has been stymied. Indeed, it is obvious that defendants' goal has been to drag out this lawsuit to put financial pressure on plaintiff.

In sum, I find that defendants have acted willfully and in bad faith. Their actions and failures pose a challenge not only to "the integrity of the discovery process," but indeed, to "the integrity of the Court." *Selby*, 1995 WL 753894, at * 8 (*quoting Rammal v. Timberland Co.*, 1995 WL 559394, at * 4 (S.D.N.Y. Sept. 20, 1995)); *see also Update Art, Inc.*, 843 F.2d at 73 (compliance with discovery orders "necessary to the integrity of our judicial process"). Defendants' actions and failures will not be tolerated.

### CONCLUSION

Defendants' answer is stricken. Judgment will be entered in favor of plaintiff for the amount of $127,212, with interest at 9% per annum from the date plaintiff should have been paid. I will also award attorneys' fees and costs for plaintiff's efforts to obtain compliance with the discovery rules and my orders, including the letters and telephone calls seeking compliance, the conferences with the Court, and the present motion for sanctions. Plaintiff shall submit a proposed judgment on notice within two weeks hereof, together with an affidavit and other appropriate documentation to support the request for fees. Defendants may submit any opposition to the fee request within two weeks thereafter.

SO ORDERED.

---

4. In January 1995, the New York State Bar Association adopted voluntary "Guidelines on Civility in Litigation." Defendants' counsel's conduct in this case violated at least four of these Guidelines:

   I. In dealing with other persons involved in the litigation process, a lawyer should be courteous and civil in all communications.

   . . . . .

   IV. A lawyer should promptly return telephone calls and answer correspondence.

   . . . . .

   VI. A lawyer should not use any aspect of the litigation process, including discovery and mo-

tion practice, as a means of harassment or for the purpose of increasing litigation expenses.

   . . . . .

   VII. In depositions and other proceedings, and in negotiations, lawyers should conduct themselves with dignity and refrain from engaging in acts of rudeness and disrespect.